OPINION
{¶ 1} Thomas T. Henderson appeals from his conviction and sentence on one count of aggravated burglary in violation of R.C. § 2911.11(A)(1).
 {¶ 2} Henderson advances three assignments of error on appeal. First, he contends he received ineffective assistance of counsel at trial because his attorney's opening statement and closing argument conceded everything necessary to convict him. Second, he claims his sentence must be vacated because he was sentenced in violation of State v.Foster, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470. In connection with this assignment of error, Henderson also argues that the remedy provided by the Ohio Supreme Court in Foster operates as an ex post facto violation. As a result, he asserts that the trial court must impose a statutory minimum sentence on remand. In his third assignment of error, Henderson contends his trial counsel provided ineffective assistance by failing to object to his sentence on the basis ofBlakely v. Washington (2004), 542 U.S. 296, 124 S.Ct. 2531,159 L.Ed.2d 403.
 {¶ 3} The present appeal stems from an altercation Henderson had with Tracey Higgins inside her home in the early morning hours of July 9, 2005. The incident resulted in Henderson being charged with aggravated burglary. The matter proceeded to a jury trial on January 23-25, 2006. The State's primary witness at trial was Higgins herself. She testified that Henderson was an ex-boyfriend who had resided in her home for several months in early 2005. He moved out at her request around May 6, 2005, and she attempted to terminate her relationship with him. After Henderson's departure, Higgins changed the locks on her doors. Contrary to her wishes, however, he continued showing up at her house and attempting to communicate with her. His conduct resulted in a civil protection order being filed against him on July 6, 2005.
 {¶ 4} Thereafter, on the evening of July 8, 2005, Higgins fell asleep on her couch after returning home from work. She awoke sometime after 1:00 a.m. on July 9, 2005, to find Henderson standing in the middle of her living room. Higgins was "shocked" when she saw him there because she thought she had locked her doors. In response to Higgins' inquiry about how he had entered the house, Henderson grabbed her by the wrists and pulled her into the kitchen. While holding her arms, he began accusing her of sleeping with his friends. He also rifled through her purse in search of his friends' phone numbers. As he did so, Higgins noticed that her keys had been removed from a deadbolt lock on the inside of her back door. She had placed the keys there upon her return home from work.
 {¶ 5} During the encounter, Henderson began hitting Higgins in the face with a closed fist. The blows caused her to fall to the kitchen floor. He then kicked her in the ribs before dragging her down a hallway and into her bedroom. Once there, he threw her on the bed, got on top of her, and began choking her. They then rolled onto the floor, where Henderson continued to choke her while holding a bedspread over her face. As she felt herself beginning to lose consciousness, Higgins reached up and knocked Henderson's glasses off of his face. He momentarily released his grip, which enabled Higgins to rise and run back into the hallway. Henderson caught her there, however, and pulled her into the kitchen a second time. He then choked her again before returning to the contents of her purse. As he did so, Higgins managed to reach her cordless phone and dial 9-1-1. Upon realizing that she had made the call, Henderson smashed the phone on the floor. He also grabbed two kitchen knives and said, "I ought to stab you in the heart right now."
 {¶ 6} At that point, Higgins heard a knock on the door and saw Henderson momentarily back away from her. After initially going toward the front door, he returned to the kitchen and punched her in the stomach. Henderson then moved toward the front door a second time before returning again and kicking Higgins in the stomach. He eventually turned away from her for good and opened the door to find Dayton police officers Donald Fink and James Baker outside. The officers entered the home and placed Henderson in handcuffs. While patting him down, they found Higgins' keys and her cell phone in his possession. The officers also attended to Higgins, who was moaning and crying in a fetal position on the floor. She was taken to the emergency room and examined. Her injuries included a chipped tooth as well as bruising, swelling, and redness at various places on her body. A subsequent investigation revealed no signs of forced entry into Higgins' residence. After the incident, however, she discovered that one of the two locks on her back door was defective and could be opened by jiggling the doorknob. Based on the foregoing evidence, the jury found Henderson guilty of aggravated burglary. The trial court sentenced him to eight years in prison. This timely appeal followed.
 {¶ 7} In his first assignment of error, Henderson contends he received ineffective assistance of counsel under Strickland v. Washington (1984),466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, because his attorney's opening statement and closing argument conceded everything necessary to convict him of aggravated burglary. Citing United States v. Cronic
(1984), 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657, he also argues that prejudice may be presumed where, as here, his attorney failed to subject the State's case to meaningful adversarial testing.
 {¶ 8} We begin our analysis with a review of the aggravated burglary statute, R.C. § 2911.11(A), which provides:
 {¶ 9} "(A) No person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply:
 {¶ 10} "(1) The offender inflicts, or attempts or threatens to inflict physical harm on another[.]"
 {¶ 11} During opening statements at trial, defense counsel conceded that an altercation had occurred inside Higgins' home and that she had sustained some injuries. Counsel insisted, however, that Higgins had invited Henderson into her home on the night in question. Therefore, defense counsel told the jury that Henderson had not trespassed by force, stealth, or deception.
 {¶ 12} The State then presented evidence at trial to establish that Higgins had not allowed Henderson into her home and that he, in fact, had entered by force through the back door. As noted above, the State primarily relied on testimony from Higgins, who told the jury that she had not invited Henderson into her house. Higgins also told the jury that she was surprised when she awoke and saw him, as she had no idea how he had gotten inside.
 {¶ 13} In response to the State's case, defense counsel elected not to dispute the fact that Henderson had caused physical harm to Higgins. Counsel's efforts during trial were directed toward establishing that Higgins had invited Henderson into her house. Although Higgins denied having done so, defense counsel nevertheless sought through cross-examination to undermine the State's theory that Henderson had entered the residence forcibly while Higgins was asleep.
 {¶ 14} During closing argument, the State reiterated its belief that Henderson had trespassed in the house by entering through Higgins' back door while she was asleep. In response, defense counsel told the jury:
 {¶ 15} "There is only one element in this case at issue. That element is how was access gained to the residence. Was it gained by force, stealth, or deception? And that issue can be narrowed down further to force. The complaining witness says it must have been force, and we say there is another way to get into that house. There's only two ways. It's either force or she let him in. It's got to be one of those two * * *."
 {¶ 16} Defense counsel then reviewed the evidence and attempted to discredit the State's theory that Henderson had entered the home by force while Higgins was asleep. In rebuttal, the State again stressed its belief that Henderson had committed a trespass by force when he entered through the back door without Higgins' knowledge or consent. The prosecutor told the jury:
 {¶ 17} "Ms. Higgins was asleep on her couch. She told you she didn't hear a vehicle. She also told you she didn't know whether [Henderson] was in her backyard when she let the dogs out. She also told you she did not invite him.
 {¶ 18} "Mr. Henderson wants to make a big deal about no pry marks. You know, the State did not show you any forcible entry. The Judge is going to give you an instruction on what force is. Force is any means necessary to get through an unlocked door. You have to turn the doorknob and push the door open. That is force. That's what we are talking about.
 {¶ 19} "We're not talking about throwing stuff through a window, breaking stuff to get into that house. We're talking about the elementary force, moving an object. That is force. Opening an unlocked door is force to get into the house.
 {¶ 20} "And I submit to you that the Defendant didn't want Ms. Higgins to know that he was there without her knowledge. He wanted to get in and take her by surprise, which he did. He grabbed her and she said, how did you get in."
 {¶ 21} "* * *
 {¶ 22} "You can infer from all the facts and all the evidence that was presented, you can infer force, you can infer stealth, you can infer that obviously if she thought she locked the door, somehow he got in there. You can infer force, you can infer stealth and you can infer deception.
 {¶ 23} "If he got in there by saying, hey, I'm going to come over and talk to you and he gets over and begins to beat her up, you can infer that he used the guise, let's chat, to get into her house."
 {¶ 24} "* * *
 {¶ 25} "And you can come to the conclusion here today that the man was not invited, he got into the house by force because he opened the door. He jiggled the door handle. He was out there when she let the dogs out and wasn't allowing the door to be locked. You can make those inferences because he got in there by God, and it wasn't because he vaporized in there. It was because he wanted to and he wanted to harm her because she can't end the relationship."
 {¶ 26} Following closing arguments, the trial court instructed the jury on the elements of aggravated burglary. In so doing, it provided instructions on trespass by force and by stealth. The trial court concluded that the evidence did not support an instruction on trespass by deception. In the course of its instructions, the trial court told the jury:
 {¶ 27} "Trespass means that the Defendant without privilege to do so knowingly entered and remained on the land or premises of another.
 {¶ 28} "Privilege means any immunity, license or right that was conferred by law or that was bestowed by an expressed or implied grant or arising out of a status position, office or relationship or growing out of a necessity."
 {¶ 29} "* * *
 {¶ 30} "Force. A force may properly means [sic] any violence, compulsion or effort or constraint exerted or used by any means upon a person or a thing to gain entry. Force may be properly defined as effort rather than violence and that force is used to gain entry into a residence and can include the opening of an unlocked door."
 {¶ 31} On appeal, Henderson cites State v. Steffen (1987),31 Ohio St.3d 111, 509 N.E.2d 383, for the proposition that a defendant may be convicted of aggravated burglary even if his initial entry into a victim's home was lawful. In Steffen, the court reasoned that one who enters a home with permission becomes a trespasser, subject to conviction for aggravated burglary, if he assaults the victim after gaining entry. Id. At 114 — 115. In support, the court reasoned that a defendant's privilege to remain in a home terminates the moment he commences an assault on a victim. Id.
 {¶ 32} Henderson contends Steffen rendered Higgins' consent or lack of consent to his entry into her home meaningless. Under Steffen, Henderson reasons, even if Higgins' consent granted him a privilege to enter her home, the privilege terminated when his assault began and made him subject to conviction for aggravated burglary. Thus, Henderson contends the crucial issue at trial was whether he assaulted Higgins inside her home, not whether she invited him to enter. Because his attorney conceded the fact of an assault inside the home, Henderson argues that he received constitutionally ineffective assistance of counsel. Moreover, Henderson asserts that he need not demonstrate actual prejudice because defense counsel failed to subject the State's case to meaningful adversarial testing.
 {¶ 33} Upon review, we find Henderson's argument to be unpersuasive. We find no ineffective assistance resulting from counsel's concession that Henderson had engaged in an "altercation" with Higgins inside her home. As an initial matter, the fact of the assault was well documented. The State presented the jury with photographs of Higgins' physical injuries. In addition, the State presented testimony that police found Henderson inside the home, where Higgins also was discovered moaning and crying in a fetal position on the kitchen floor. In light of this evidence, defense counsel reasonably may have concluded that hecould not seriously dispute the fact of the assault. Indeed, defense counsel legitimately may have determined that the only possible course of action was to challenge the State's theory of an unlawful initial entry into Higgins' home. As the United States Supreme Court recognized in Cronic, "the Sixth Amendment does not require that counsel do what is impossible or unethical. If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade." Cronic, 466 U.S. at 656 n. 19.
 {¶ 34} Here Henderson's counsel reasonably may have concluded that there was no bona fide defense to the fact of the assault on Higgins inside her home. Even though the assault itself may have created some risk of a conviction under a Steffen-type theory,[1] defense counsel avoided that issue and instead directed the jury's attention to the State's theory of a forcible entry into the home. On that issue, which was the only one Henderson fairly could dispute, defense counsel sought to create reasonable doubt in the jurors' minds. On the record before us, we see nothing more that counsel could have done. Therefore, Henderson's attorney did subject the State's case to adversarial testing. His first assignment of error is overruled.
 {¶ 35} In his second assignment of error, Henderson contends the trial court erred by imposing more than the statutory minimum sentence for his offense. In support, he argues that the sentence he received violatesState v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, because the trial court itself made certain statutorily required findings of fact to support the sentence.
 {¶ 36} "Foster established a bright-line rule that any pre-Foster sentence to which the statutorily required findings of fact applied (i.e., more-than-minimum, maximum, and consecutive sentences), pending on direct review at the time that Foster was decided, must be reversed, and the cause remanded for re-sentencing in accordance withFoster, if the sentence is a subject of the appeal." State v. Boyd, Montgomery App. No. 21372, 2006-Ohio-6299, ¶ 28. The State concedes thatFoster applies here and that Henderson was sentenced in violation of the rule articulated in that case. We agree. Accordingly, we will vacate Henderson's sentence and remand the cause for re-sentencing.
 {¶ 37} We find no merit, however, in Henderson's additional argument that ex post facto principles preclude the trial court from imposing anything more than the statutory minimum sentence on remand. This court fully addressed and rejected the same argument in State v. Smith, Montgomery App. No. 21004, 2006-Ohio-4405, ¶ 30-34, and we find no reason to depart from our prior ruling. Therefore, on remand the trial court may impose any sentence within the applicable statutory range. Henderson's second assignment of error is sustained in part and overruled in part.
 {¶ 38} In his third assignment of error, Henderson contends his trial counsel provided ineffective assistance by failing to object to his sentence on the basis of Blakely v. Washington (2004), 542 U.S. 296,124 S.Ct. 2531, 159 L.Ed2d 403. We note, however, that Blakely was a forerunner to the Ohio Supreme Court's more recent decision inFoster, which itself requires a remand for re-sentencing in this case. Given that we are vacating Henderson's sentence pursuant toFoster, his third assignment of error is overruled as moot.
 {¶ 39} Having sustained Henderson's second assignment of error in part, we hereby affirm his conviction for aggravated burglary but vacate his sentence and remand the cause for re-sentencing.
WOLFF, P.J., and DONOVAN, J., concur.
[1] Parenthetically, we note that a Steffen-type argument was not the focus of the State's case at trial. As set forth above, the State's theory plainly was that Henderson committed an unlawful trespass by force when he entered Higgins' home through the back door. Only once did the State even suggest that an aggravated burglary conviction could be based on anything else. On that one occasion, the State told the jury, during closing argument, that "if [Henderson] got in there by saying, hey, I'm going to come over and talk to you and he gets over and begins to beat her up, you can infer that he used the guise, let's chat, to get into her house." This argument suggests the possibility of a conviction based on trespass by deception. Notably, however, the trial court subsequently declined to instruct the jury on trespass by deception. As a result, we find no reasonable likelihood that the jury convicted Henderson based on such a theory.